# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| **FREDERICH G. MEDER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case number 4:06cv0790 TCM** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,[1]** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying the application of Frederich G. Meder for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, is before the Court, see 28 U.S.C. § 636(c), for a final disposition. Mr. Meder has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Frederich Meder ("Plaintiff") applied for DIB in June 2003,[2] alleging he was disabled as of November 16, 2002, by asthma, carpal tunnel syndrome, hernia, low back pain, migraines, gastroesophageal reflux disease ("GERD"), left knee pain, sinus problems, and

---

[1]Mr. Astrue became the Commissioner of Social Security after the filing of this action and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2]An earlier DIB application had been denied in August 2000.

anxiety and depression. (R. at 56-58.)[3] This application was denied initially and after a hearing held in April 2005 before Administrative Law Judge ("ALJ") Thomas C. Muldoon. (Id. at 13-23, 28-47, 49-52.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 5-7.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified that he was 42 years' old, married, and without children. (Id. at 31.) He had completed three years of college and had "extensive electronic and communication training when in the Army." (Id.) He was honorably discharged from the Army after twelve years of service. (Id. at 32.) He was receiving 100% disability from the Veterans' Administration ("VA") for his knees, lower back, headaches, sinus problems, carpal tunnel syndrome in both hands, anxiety, and depression. (Id.) He receives his medical treatment from the VA, including monthly meetings with his counselor. (Id. at 32-33.)

He has a damaged meniscus in his left knee and cartilage damage in his right knee. (Id. at 33.) Although he had had two surgeries on his left knee and one on his right knee, the surgeries only partially alleviated the problems. (Id.) His left knee no longer buckled, but there was now arthritis in it and in the right knee. (Id.) He has knee pain everyday; weather and dampness irritate it and stair climbing or going up inclines make it worse. (Id. at 34.)

---

[3]References to "R." are to the administrative record filed by the Commissioner.

He could not stand for longer than five or ten minutes without feeling pressure on his knees. (<u>Id.</u>) He wears braces on both knees during the day. (<u>Id.</u>) These limit his ability to bend or stoop. (<u>Id.</u> at 35.) Also, he wears braces on his hands during the night because he has carpal tunnel syndrome. (<u>Id.</u>) His hands go numb if he works with small tools, types, or writes longer than fifteen minutes. (<u>Id.</u>) He has migraine headaches a couple of times a week that are triggered by stress or depression. (<u>Id.</u> at 35-36.) The migraines last most of the day; and, if temporarily relieved by medication, resume after a few hours. (<u>Id.</u> at 36.) He also has sinus headaches and irritable bowel syndrome ("IBS"). (<u>Id.</u>) Medication and dietary fiber help alleviate the IBS, although he is reluctant to leave the house because of the IBS. (<u>Id.</u> at 37.) Odors, certain chemicals, dust, and a sudden change in weather trigger asthma attacks. (<u>Id.</u> at 37-38.)

His depression causes him to be short-tempered. (<u>Id.</u> at 38.) He has memory problems; consequently, he forgets sometimes to take his medication. (<u>Id.</u> at 39.) He takes fourteen medications, including one for pain. (<u>Id.</u> at 40.) His medications make him groggy, and by noon he is sleepy. (<u>Id.</u>) He sleeps from noon to two or three o'clock in the afternoon. (<u>Id.</u>)

After leaving the military, he worked for a year as a substitute teacher. (<u>Id.</u>) He had to leave this job because he had attendance problems and an injury that aggravated his back. (<u>Id.</u>) He suffered some back injuries when he was on active duty. (<u>Id.</u> at 41.) His back pain was constant, varying only in degree. (<u>Id.</u>) He also has tinnitus and constantly hears ringing. (<u>Id.</u>)

Asked how much weight he could carry, Plaintiff explained he could lift five or ten pounds.  (Id. at 42.)  If he lifted more, he would be in bed for a few days with back and knee pain.  (Id.)  He can sit comfortably for fifteen or twenty minutes.  (Id.)  He then has to get up and move around.  (Id. at 43.)  He has problems climbing stairs.  (Id.)

Asked to describe his typical day, Plaintiff explained that he makes a pot of coffee after getting up, watches television, tries to do some laundry or cut the grass, and, occasionally, cooks.  (Id. at 43-44.)  He seldom socializes.  (Id. at 44.)  He occasionally goes grocery shopping with his wife.  (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from various health care providers, and reports of consultants.

Completing a disability report, Plaintiff listed his height as 6 feet and his weight as 240 pounds.  (Id. at 67.)  His impairments first bothered him in August 1992 and prevented him from working as of November 16, 2002.  (Id. at 68.)  His last job was as a substitute teacher.  (Id. at 69.)  In a separate, work history report, Plaintiff described this job as requiring six hours of walking and standing in an eight-hour day, sitting for two hours, kneeling or crouching for four hours, handling big objects for two hours, and writing for six hours.  (Id. at 82, 84.)  The heaviest weight he lifted was fifty pounds and the weight he frequently lifted was twenty-five pounds.  (Id.)

On another form, Plaintiff reported that he was able to do all but two – ironing and car maintenance – of the thirteen listed chores. (<u>Id.</u> at 93.) Of the remaining eleven chores, he had to make accommodations in eight; for instance, he could vacuum a little at a time. (<u>Id.</u>) He no longer fished, hunted, camped, or hiked. (<u>Id.</u>) He can watch an hour television show, but not a two-hour show. (<u>Id.</u>) He has to be reminded to complete chores. (<u>Id.</u> at 95.) The next month, he completed the same form and reported that he could no longer do six of the thirteen chores. (<u>Id.</u> at 99.)

Plaintiff's earnings statement reflect annual income between the years 1979 through 2003, when he earned $17,187.31. (<u>Id.</u> at 59.) In 2002, his reported annual earnings were $8,413.12. (<u>Id.</u>)

The relevant medical records[4] of Plaintiff are summarized in chronological order as follows. The majority of these records are from the VA Medical Center.

The earliest medical record is that of December 20, 2000, when Plaintiff consulted Richard F. Howard, D.O., about his bilateral hand numbness and tingling. (<u>Id.</u> at 117-18.) He reported having a one year history of shooting pains, numbness, and tingling in his hands, worse in his right hand and in the morning when he first woke up. (<u>Id.</u> at 117.) Recent nerve conduction studies were normal. (<u>Id.</u> at 117, 123-24.) His past medical history was described as unremarkable. (<u>Id.</u> at 117.) Past surgeries included bilateral knee arthroscopy. (<u>Id.</u>) On examination, his pronator sign, Tinel's sign, and Spurling's test were each negative.

---

[4]Records for such health concerns as dental problems and for isolated problems such as diarrhea following a meal of Mexican food are not included.

(Id.)  His Phalen's test and median nerve compression test were each positive bilaterally.

(Id.)  His elbow flexion test was negative.  (Id.)  Dr. Howard's assessment was mild bilateral carpal tunnel syndrome, greater on the right than on the left.  (Id.)  He recommended a conservative treatment, beginning with wrist splints to be worn at night and an immediate injection in his right wrist.  (Id. at 117-18.)

On January 10, 2001, Plaintiff consulted W. Mark Breite, M.D., with Thoracic & Critical Care Medicine, L.L.C., about increasing dyspnea (shortness of breath) and a burning sensation in his chest.  (Id. at 130-31.)  He denied having any other problems, although he did have a history of IBS, migraine headaches, chronic rhinitis, sinusitis, osteoarthritis in his knees, degenerative disc disease in his lumbar spine, and an inguinal (groin) hernia.  (Id. at 130.)  He had had a forty pound weight gain in the past year.  (Id.)  Dr. Breite's impression was that Plaintiff's symptoms were probably related to chronic rhinitis, resulting from allergies, and nocturnal GERD.  (Id. at 131.)  Plaintiff was to be scheduled for various tests to confirm this diagnosis.  (Id.)  One test confirmed that he had GERD and had a hiatal hernia.  (Id. at 132.)

Six days later, Plaintiff consulted the Occupational Medicine Specialty Center at Jefferson Memorial Hospital about low back strain following an injury on January 5.  (Id. at 128.)  He was released to return to work full duty.  (Id.)  The next day, he returned to Dr. Howard, who noted that the steroids Plaintiff had been taking for his back had "markedly diminished his carpal tunnel symptoms."  (Id. at 119.)  He was wearing the wrist splints.

(Id.)  He reported that the injection had not helped, and that his fingers got swollen, sometimes tingled, and were numb.  (Id. at 121.)

On February 1, Plaintiff again consulted Dr. Breite.  (Id. at 133-34.)  Pulmonary function tests performed that day "demonstrate[d] predominantly small airways obstruction with an improvement following inhaled bronchodilator, consistent with mild asthma."  (Id. at 133.)  Plaintiff reported that his rhinitis, postnasal drip, and dyspepsia (impaired gastric function) were improved.  (Id. at 133, 135-37.)  Medication was prescribed for his allergic rhinitis and he was to be scheduled for a test to rule out Barrett's esophagus.  (Id. at 133-34.)

On February 28, Plaintiff returned to Dr. Howard with a new complaint, right elbow pain, after digging around his house to resolve a water leak.  (Id. at 120.)  Dr. Howard attributed the pain to the digging.  (Id.)  Plaintiff's carpal tunnel symptoms had returned after he stopped taking the steroids for his back.  (Id.)  The symptoms were mild, however, and occurred at the end of the day.  (Id.)  Plaintiff was fit with a brace for his tennis elbow, was to continue wearing the splints, and was to follow-up as needed.  (Id. at 120.)

Plaintiff reported to Dr. Breite on March 26 that the medication for his rhinitis had caused him nosebleeds.  (Id. at 138.)  Consequently, he had stopped taking it and had developed recurrent sinus congestion and rhinorrhea.  (Id.)  His dyspepsia had improved on Prilosec.  (Id.)  Dr. Breite's impression was of recurrent rhinitis, mild asthma and small airways asthma, and GERD, possible Barrett's esophagus.  (Id.)

Plaintiff first consulted the physicians at the VA Medical Center on August 21.  (Id. at 141-48.)  He complained of sinus congestion, occasional lightheadedness with shortness

of breath after walking far, and frequent gas and bloating. (<u>Id.</u> at 145.) He denied any chest pain and his only muscloskeletal complaint was knee problems. (<u>Id.</u>) He was continued on his current medications and was to return in four months. (<u>Id.</u>) In December, Plaintiff went to the VA emergency room with complaints of low back pain radiating to his groin. (<u>Id.</u> at 151-53.) He reported that he had had spasms since 1992; an x-ray and computed tomography ("CT") scan of his lower spine were normal. (<u>Id.</u> at 152.) It was noted that he was seeing a private physician and was taking Flexeril, a muscle relaxant, in addition to the prescriptions from the VA. (<u>Id.</u>) He was advised to follow-up with that physician and to have a magnetic resonance imaging ("MRI") of his spine. (<u>Id.</u>)

Plaintiff consulted the physicians at the VA on January 9, 2002, about his IBS, pain in his lower right hip and pelvis, blood in his stool, headaches, and sinus problems. (<u>Id.</u> at 155-60.) He was having difficulty walking because of his hip pain and wanted a disabled parking sticker. (<u>Id.</u> at 157.) The assessment was of IBS, rectal bleeding, and migraines. (<u>Id.</u>) Plaintiff was a walk-in patient at the VA Medical Center on May 16, complaining of pain in the right side of his neck and of a sore throat. (<u>Id.</u> at 162-68.) He was otherwise "fairly asymptomatic." (<u>Id.</u> at 163.) He wanted a prescription filled. (<u>Id.</u> at 167.) It was explained that he would need to see a doctor and could be seen between scheduled patients. (<u>Id.</u>) He declined to wait. (<u>Id.</u>)

Plaintiff did return, however, on June 6 with complaints of sinus congestion, postnasal drip, nasal discharge, coughing, and frontal sinus headaches. (<u>Id.</u> at 168-72, 232-33.) He was prescribed a medication and was told to follow-up with his primary care physician. (<u>Id.</u>

at 170.)  On June 29, after taking a high blood pressure reading at home, Plaintiff went to the VA emergency room.  (Id. at 173-76.)  An electrocardiogram showed sinus tachycardia and possible right ventricular hypertrophy.  (Id. at 173.)  The impression was of possible hypertension, anxiety disorder, and obesity.  (Id.)  He was to avoid outdoor activities, cut down on his salt and carbohydrate intake, and check his blood pressure three times daily.  (Id.)  Plaintiff returned to the emergency room on July 5.  (Id. at 179-80.)  He had had an intermittent fever for the past week, a sore throat and nasal congestion for the past two days, and high blood pressure at night.  (Id. at 189.)  "He seemed to be anxious."  (Id.)  And, he had sharp chest pains lasting for a few seconds.  (Id.)  He was to follow-up with his primary care physician and was encouraged to diet and exercise.  (Id. at 177.)

Plaintiff next went to the VA emergency room at midnight on September 5 for complaints of low back pain. (Id. at 181-87.)  He reported that he had injured his back when in the military and serving in Belgium in September 1999.  (Id. at 181.)  A November 1999 x-ray had revealed degenerative disc disease.  (Id.)  He had reinjured his back that afternoon "with minor twist."  (Id.)  The pain had started at L5 and had radiated to his right hip.  (Id.)  He was not admitted, but did receive two injections and told to avoid lifting and bending.  (Id.)  Plaintiff went to the VA primary care clinic on November 18.  (Id. at 188-96.)  He had low back pain and a migraine headache; however, he was there for laboratory work, which could not be performed because he had not fasted as required.  (Id. at 194.)

Following an accident in which the car he was driving was struck by a truck, Plaintiff went to the emergency room at the Mineral Area Regional Medical Center ("MARMC") on

December 4 with complaints of low back and left knee pain.  (Id. at 236-41.)  X-rays of his spine and left knee were negative; Plaintiff was released with medication and instructions to rest and apply heat.  (Id. at 237, 241.)

Plaintiff went to the VA primary care clinic on January 6, 2003, for his annual physical examination.  (Id. at 197-202.)  His complaints were of low back and bilateral knee pain; frequent headaches; sinus problems; and occasional chest pains on his right side.  (Id. at 198.)  The physician, Sheikh Sadiq, M.D., could find "little objective need" for Plaintiff's use of inhalers, noting that his expiratory rate was comfortable and not symptomatic of any breathing problem.  (Id. at 199.)  Plaintiff was able to walk well on heels and toes, could hop on either foot alone, squat down in a semi-squat position, straight leg raise to 75 to 80 degrees without difficulty, perform a full range of hip movements, and bend the knees without much difficulty.  (Id.)  Dr. Sadiq described the physical examination as "negative." (Id.)  He did not find "much objective evidence of chronic obstructive pulmonary disease or degenerative arthritic disease."  (Id.)  He asked Plaintiff to monitor his blood pressure and questioned whether Plaintiff had an underlying compensation neurosis and should be referred to the mental health clinic.  (Id.)

Five days later, Plaintiff consulted Raffi Kirkorian, M.D., at MARMC about tightness in his chest and numbness in his left arm.  (Id. at 243-46.)  These conditions were not associated with exertion, food, or physical or emotional stress.  (Id. at 243.)  His medical history was significant for hypertension and degenerative joint disease with bad knees.  (Id.) Tests revealed "[d]ecreased compliance of the left ventricle, consistent with mild left

ventricular diastolic dysfunction," "[m]ild concentric left ventricular hypertrophy," and "[n]ormal heart chamber sizes with a left ventricular ejection fraction of 60%." (Id. at 245.) There was also "[m]ild intimal thickening bilaterally in the common carotid arteries and less than 50% soft plaque in the proximal right internal carotid artery." (Id. at 246.) There was no significant valvular disease. (Id. at 245.)

X-rays of Plaintiff's left elbow and left forearm on March 7 were negative. (Id. at 242.) A few weeks later, on March 24, Plaintiff began physical therapy for his low back pain and strained left elbow. (Id. at 247-49.) He explained that his symptoms from his December accident had largely resolved, but then he had been in another car accident in February when the car he was driving was rear-ended. (Id. at 247.) "[R]eptitive bending, lifting greater than 10-20 pounds, bowling, sitting at the computer, static positions, or sitting for more than 10 minutes" aggravated his back pain. (Id.) The pain was worse in the morning, and disturbed his sleep. (Id.) At its worst, the pain was an eight on a ten-point scale, with ten being the most excruciating, and three at its best during the past month. (Id.) He walked into the physical therapy department without any assistive device and with a normal gait. (Id.) He had a 50% loss of range of motion on flexion and lateral flexion to the left, a 75% loss on extension, and a 25% loss on lateral flexion to the right. (Id. at 248.) On examination, tenderness was noted with palpation over the L4-5 region and there was a knot there. (Id.) Therapeutic exercises were deferred at the first session due to Plaintiff's time constraints. (Id.) Two days later, several therapeutic exercises were initiated. (Id. at 250-51.) The therapist attributed his increased pain to the sustained flexed position that was required when

he worked on his car.  (Id. at 250.)  Two days after this session, Plaintiff cancelled the next three appointments, explaining that his pain was worse after he worked on a car during the weekend and that he needed to make several trips.  (Id.)  The next session Plaintiff participated in was on April 14, two weeks after the first cancelled appointment.  (Id. at 252.) He reported that he had been feeling better until he had planted grape vines over the weekend, resulting in increased pain.  (Id.)  Plaintiff was treated with heat to the back for twenty minutes and an ultrasound with electrogalvanic stimulation ("EGS") for eight minutes.  (Id.)  His range of motion and his strength were not assessed due to Plaintiff's time constraints.  (Id.)  At his next session, on April 23, Plaintiff reported that his back was feeling better and that the ultrasound with EGS had helped.  (Id. at 253.)  He requested that his exercises be deferred.  (Id.)  He was unable to attend physical therapy sessions the remainder of the week for personal reasons.  (Id.)  On April 28, his lumbar range of motion on flexion had increased to 75 to 100%, on extension and lateral flexion to the right to 100%, and on lateral flexion to the left to 75%.  (Id. at 254.)  He had a decrease in his overall pain level, but got a sharp pain in the right side of his back if he lifted something with a twisting motion.  (Id.)  He was instructed not to do that.  (Id.)  Plaintiff's next reported session was on May 28.  (Id. at 255-56.)  He still had pain in the right side of his low back "with increased lifting or heavier activities."  (Id. at 255.)  He had missed previous sessions because of poison ivy and was leaving town the next day to visit friends on the east coast. (Id.)  He would resume physical therapy when he returned.  (Id.)

At his next visit to the primary care clinic, on May 1, Plaintiff did request a referral to the mental health clinic.  (Id. at 203-08.)  He also complained of low back and bilateral knee pain.  (Id. at 204.)  The pain was a six on a ten-point scale; this was the highest it had been to date.  (Id.)  His pain medication was not effective.  (Id. at 205.)

Chest x-rays taken on May 16 showed bronchitis.  (Id. at 258.)

On June 9, Plaintiff consulted Kirk E. Flury, M.D., a pulmonary specialist, about the possible relationship between his asthma and his military service in a missile silo.  (Id. at 261-65.)  Dr. Flury concluded that "there [was] simply no way to associate his current ongoing symptoms with that exposure."  (Id. at 261.)  He further concluded that Plaintiff's asthmatic symptoms "did not even come close to qualifying him for respiratory related disability[.]"  (Id.)

Plaintiff consulted a VA psychiatrist, David Busby, M.D., on August 28.  (Id. at 354-55.)  Although he was sleeping better and was less depressed, he was still irritable and worried about his irritability.  (Id. at 354.)  He attributed this to financial concerns and legal fights.  (Id.)  He was rational, coherent, and had a good affect.  (Id.)  "There [was] no depression or abnormal ideas."  (Id.)  His Global Assessment of Functioning ("GAF") was 70.[5]  (Id.)

---

[5]"According to the [Diagnostic Manual], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).  See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)).  A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or

On September 22, Plaintiff went to the VA urgent care clinic after injuring his right shoulder two weeks before.  (Id. at 349-54.)  He had been moving bundles of metal fence posts and when he had them over his shoulder, had hit it.  (Id. at 353.)  His shoulder was painful and had a limited range of motion.  (Id.)  X-rays of the shoulder showed mild degenerative arthritis in his acromioclavicular joint.  (Id. at 272, 313.)  Plaintiff was prescribed Tylenol #3 and advised to wear an arm sling for two to three weeks.  (Id. at 354.)

Plaintiff consulted a psychiatrist, Teresa Neira, M.D., with the VA on September 26 about his depression and anxiety.  (Id. at 348-49.)  He was trying to finish his bachelor's degree, but his anxiety interfered with his functioning.  (Id. at 349.)  Although he appeared anxious, his speech was directed and coherent and his attention and concentration were good.  (Id.)  He had good insight into his problems.  (Id.)

On October 8, on referral by Dr. Ihsan Haq, Plaintiff consulted Donna Parkinson, Ph.D., a clinical psychologist.  (Id. at 284-86, 340-41.)  Plaintiff reported that he was overwhelmed, stressed, and irritated by recent stressful events that were "bombarding" him.  (Id. at 284.)  These events included having the payments for his service-connected 60% disability reduced by one-fourth for the recoupment of severance benefits the Army was contending were paid him in error and having his elderly mother live with him and his wife and having to financially assist her.  (Id.)  Additionally, Plaintiff explained that he had been employed by a school district as a permanent substitute teacher and had been working with

_____

school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  Diagnostic Manual at 34 (alteration added).

- 14 -

high school students who had been suspended from regular classes due to substance abuse. (Id.) He had also been asked to do some computer work for the district. (Id.) He was placed on involuntary leave after some pornography had appeared on the computers in his classroom, and, although the criminal investigation had ended with no charges being filed and his contract had been bought out by the district, he was concerned that a background check would prevent a school district from hiring him. (Id. at 284-85.) He also attributed the beginning of his present problems with the Army keeping him on an overweight program although he was not and medically discharging him when he had passed all the requirements for advancement. (Id. at 284.) Plaintiff further reported that the psychiatric medication prescribed for him was helping, but he needed supportive therapy to help him cope with the ongoing stress. (Id. at 285.) Dr. Parkinson diagnosed him with depressive disorder, not otherwise specified ("NOS"), and hoped to meet with him monthly. (Id.)

That same day, Plaintiff was seen by Dr. Sadiq for a refill of his Metamucil for his IBS. (Id. at 342-48.) He also had been having migraines. (Id. at 348.) Noting that Plaintiff's examinations and investigations had all been negative, Dr. Sadiq opined that he had a tendency for somatization. (Id.) He diagnosed Plaintiff with somatization disorder with compensation neurosis. (Id.) Plaintiff was to see him again in a few months. (Id.)

A November 18 notation by Dr. Neira with the psychiatry clinic, remarks that Plaintiff "admit[ted] to poor compliance." (Id. at 309, 335-36.) He was anxious, easily irritated, angry, and worried about losing his temper and hurting someone. (Id. at 309.) Dr. Parkinson met with Plaintiff on December 11 for individual therapy. (Id. at 304-05, 330-31.) He was

having legal problems with the neighbors on either side of his property and was consulting with a lawyer about the initial denial of his DIB application. (Id. at 304-05.) His Pell grant to attend school was denied due to lack of academic progress. (Id. at 305.) Plus, his wife would not be able to finish her teaching certificate until five months later than planned, making their financial situation worse. (Id.) He expressed frustration with his health care, complaining that his medications were constantly being changed because he did not see the same physicians. (Id.) The diagnosis was anxiety disorder, NOS. (Id.)

X-rays taken on December 12 of Plaintiff's knees did not reveal any abnormalities. (Id. at 271-72, 312-13.)

Dr. Parkinson saw Plaintiff again on January 6, 2004. (Id. at 302-03, 328-29.) Plaintiff talked about the financial strain he was under, his frustration with several recent events, and his inability to get hired after prospective employers saw his list of medical problems. (Id.) He also reported that his Pell grant had been reinstated after he successfully completed several courses. (Id.) The diagnosis was depressive disorder, NOS. (Id. at 303, 329.)

The next month, on February 10, Plaintiff saw a psychiatrist, Jerry L. Wessel, M.D. (Id. at 301, 326-27.) He had not been taking his antidepressants for fear of liver damage. (Id. at 301.) He was described as "somewhat irritable" and with "some anxiety." (Id.) Dr. Wessel concluded that it was hard to evaluate any depression. (Id.) His diagnosis was

anxiety disorder, chronic. (Id.) He assessed Plaintiff's GAF at 60.[6] (Id.) That same day, Plaintiff saw Dr. Haq. (Id. at 294-95, 319-20.) Dr. Haq noted that Plaintiff had been diagnosed with somatization disorder, chronic migraines and depression. (Id. at 294.) He also had continuing problems with right knee pain. (Id.) Dr. Haq was prescribed two medications to help him sleep and a proton pump inhibitor for his GERD. (Id. at 295.) He was to follow up in the mental health clinic for his depression and the dietician clinic for his obesity. (Id.)

An arthrogram taken of Plaintiff's right shoulder on February 19 was normal. (Id. at 270-71, 311-12.) An MRI taken the next day of his left knee revealed a complete tear and degenerative intercepts type changes in the posterior horn medial meniscus and small joint effusion. (Id. at 269-70, 311.)

Chest x-rays taken on March 9 showed only calcifications in the lungs from old granulomatous disease. (Id. at 269, 310-11.)

Dr. Wessel saw Plaintiff again on March 22. (Id. at 290-91, 315.) He noted that Plaintiff was not sure if the medications he was taking were helpful. (Id. at 290.) The medications were discontinued and another, mirtazapine (Remeron), was added. (Id.) That same day, Dr. Parkinson saw Plaintiff. (Id. at 291-92, 315-16.) Plaintiff had been unable to keep his February appointment because he had been ill. (Id. at 291.) They discussed the

_____

[6]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic Manual at 34 (alteration added).

various stressful events in Plaintiff's life and strategies for coping with same. (Id.) He was uncertain about what medications he should be taking. (Id.) The diagnosis was anxiety disorder, NOS. (Id.)

Plaintiff consulted Dr. Haq at the primary care clinic on April 15 for bilateral knee pain. (Id. at 225-31.) He explained that the Percocet he had been taking had controlled the pain, but he had run out of the medication and wanted it renewed. (Id. at 225.) Explaining about addiction and tolerance, Dr. Haq declined and prescribed Tylenol #3. (Id.) Dr. Haq also discussed with Plaintiff the stress he was under – he and his wife were both going to school to obtain teaching certificates and he was taking care of his elderly mother – and his anger "about his pension system." (Id. at 226.) Plaintiff's pain was described as being under control at the end of the visit. (Id. at 227.)

On May 10, Satish Agarwal, M.D., restarted Plaintiff on bupropion, an antidepressant, and continued him on Remeron, to be taken at bedtime. (Id. at 225.) Plaintiff had reported at this visit that he had done better when taking bupropion. (Id. at 224.) Plaintiff also reported that he was sleeping better with the Remeron. (Id.) He continued, however, to be under a lot of stress and to have difficulty managing problems and situations. (Id.) He easily became irritable and anxious. (Id.) He was not suicidal. (Id.) The same day, Plaintiff was seen by Dr. Parkinson for individual therapy. (Id. at 223-24.) He had recently found out that the program he was in at school would not qualify him for a teaching certificate. (Id. at 223.) He was described as "continu[ing] to engage in rescuing behaviors for various family members" and to feel like he was a bad person if he did not rescue people. (Id. at 223-24.)

His mood was "mildly" depressed.  (<u>Id.</u> at 223.)  Self-esteem issues were explored with him.  (<u>Id.</u> at 224.)

X-rays taken on June 22 of Plaintiff's knees, lumbosacral spine, and sinuses revealed no abnormalities.  (<u>Id.</u> at 211-13.)

On July 21, Plaintiff had another individual therapy session with Dr. Parkinson.  (<u>Id.</u> at 222-23.)  His mood was again described as mildly depressed.  (<u>Id.</u> at 223.)  He had had to give up some space that he had used as a retreat and had recently had to deal with a neighbor's unfinished septic tank project.  (<u>Id.</u>)  He felt that he had to make a scene to get people to pay attention to him, but was trying to avoid doing so.  (<u>Id.</u>)  The diagnosis was again depressive disorder, NOS.  (<u>Id.</u>)

On August 20, Plaintiff consulted Dr. Haq about releasing him to go to school.  (<u>Id.</u> at 218-22.)  He explained that he had had surgery on his left knee and was found to have degenerative changes of the lateral meniscus and small joint fusion.  (<u>Id.</u> at 218.)  He was doing better.  (<u>Id.</u> at 219.)  His pain was under control; he rated it as a two.  (<u>Id.</u> at 218, 221.)  He had no feelings of depression or hopelessness.  (<u>Id.</u> at 221.)  The results of Plaintiff's liver function tests were elevated; a study was requested to rule out cholelithiasis (gallstones).  (<u>Id.</u> at 217.)  He was continued on his present medications and advised to lose weight.  (<u>Id.</u> at 219, 222.)

One week later, a friend of Plaintiff's called a VA psychologist to report his concern about Plaintiff's mental health, explaining that Plaintiff was very angry, upset by everything, had a "short fuse," and was "talking crazy."  (<u>Id.</u> at 217.)

Plaintiff consulted Dr. Haq on October 6 for his left knee pain, was prescribed Tylenol #3 and ibuprofen, and was advised to wear his knee braces.  (Id. at 433-38.)

Dr. Parkinson met with Plaintiff on October 18.  (Id. at 432.)  He had an euthymic mood and a normal range of affect.  (Id.)  He reported that he had not been compliant with his medication because it made him drowsy and he needed to drive back and forth to class. (Id.)  He was having difficulty with some classes, but was not concerned because he did not intend to complete his degree.  (Id.)  He did plan to apply to the VA for unemployability. (Id.)

One week later, Plaintiff consulted Dr. Haq to request a form for a special license for cross bow hunting, explaining that his hands became numb by pulling the string of a regular bow and holding it.  (Id. at 427-31.)  Dr. Haq signed a one-year exemption for crossbow. (Id. at 429.)

Plaintiff had another session with Dr. Parkinson on November 15.  (Id. at 426-27.) He was "mildly anxious and irritable."  (Id. at 426.)  He had to drop out of school for lack of transportation.  (Id.)  He had an "extremely low" tolerance for stress and was easily upset. (Id.)  He had resumed taking his Wellbutrin (bupropion) and sometimes took his mirtazapine. (Id.)  He was encouraged to take his medication as prescribed.  (Id.)

Plaintiff was seen by Dr. Haq on December 15 about fatty tissue around his left lower cage for the past five years and stomach pain.  (Id. at 421-26.)  He had reconsidered the question of surgery and wanted to proceed.  (Id. at 424.)

Plaintiff again consulted a VA psychiatrist, Dr. Agarwal, and Dr. Parkinson on January 21, 2005. (Id. at 419-20.) Dr. Agarwal noted that Plaintiff's last visit to the clinic was in May 2004 and that he had been non-compliant with medication. (Id. at 419.) Plaintiff reported that his wife had obtained a teaching job in another city and came home on weekends. (Id. at 420.) He had a tendency to be angry and irritable. (Id.) He stayed at home, did little, and slept in the afternoon. (Id.) At night, he slept "off and on." (Id.) He told Dr. Parkinson that he was taking three-hour naps in the afternoon. (Id. at 419.) She described him as "mildly disgruntled" and discussed with him his non-compliance with medication. (Id.)

In addition to the records of Plaintiff's treatment by various health care providers, the record included reports of examining and non-examining consultants, disability decisions b the VA, and answers by a vocational expert to written interrogatories.

In September 2003, Plaintiff was examined by Michael O'Day, D.O., pursuant to his DIB application. (Id. at 357-62.) Plaintiff's complaints were of knee problems, bilateral carpal tunnel syndrome, low back pain, anxiety and depression, GERD, and asthma. (Id. at 357-58.) Dr. O'Day's examination revealed, among other things, no evidence of heat, swelling, tenderness or ligamentous laxity in his knees and ankles, full range of motion in his knees, well preserved bilateral mobility in thumbs to fingertip, equal deep tendon reflexes in upper and lower extremities, normal tandem walking, an unremarkable gait, an ability to squat independently, and well done bilateral heel to shin and finger to nose testing. (Id. at 359.) In his range of motion, Plaintiff was limited only in his ability to do straight leg raising

from a supine position, being able to raise both legs to only 70 degrees rather than the 90 degree high end of the range. (Id. at 361-62.) His ability to, among other motions, flex his wrists, neck, knees, hips, and cervical and lumbar spine was not diminished. (Id.) Dr. O'Day described Plaintiff's GERD and reversible airways disease as well controlled with medication, his anxiety and depression as helped "overall" by medication,[7] and his migraines as "periodic – common variety" and helped by medication. (Id. at 359.) Dr. O'Day concluded as follows:

> I believe this gentleman is able to lift at least 25-35 pounds on an occasional basis. He does have a mild degree of thoracic osteoarthritis and a history of lumbar strain without features of compressive neuropathy. He is quite overweight as well. He is able to bend and stoop without restriction whereas crouching and squatting could be done occasionally given his excess weight and history of knee surgeries in my opinion. He should probably avoid polluted atmospheric environments and temperature extremes given his tendency towards asthma. I believe he is able to stand and or walk at least six hours daily with ordinary rest periods and sit for eight hours with ordinary rest periods. No restrictions apply at the upper or lower extremities in terms of the fine or gross motor skills – handling, grasping or fingering – foot controls. He is able to utilize ladders-scaffolding on occasion and staircases should not present a major problem.

(Id. at 360.)

The same month, Joan Singer, Ph.D., completed a Psychiatric Review Technique form ("PRTF") for Plaintiff. (Id. at 363-74.) Dr. Singer concluded that Plaintiff's mental impairment, an anxiety disorder, was not severe. (Id. at 363, 366.) Specifically, it resulted in mild restrictions of his activities of daily living, mild difficulties in maintaining social

---

[7]This assessment was based on Plaintiff's own description.

functioning, mild difficulties in maintaining concentration, persistence, and pace, and no repeated episodes of decompensation of any duration.  (Id. at 371.)

The following month, Harold Ridings, M.D., completed a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff.  (Id. at 375-82.)  The primary diagnosis was asthma; other impairments included low back pain, migraines, GERD, and a history of knee surgery.  (Id. at 375.)  These impairments resulted in exertional limitations of being able to occasionally lift fifty pounds; frequently twenty-five pounds; stand, sit, or walk about six hours in an eight-hour workday; and an unlimited ability to push or pull.  (Id. at 376.)  He had no postural, communicative, manipulative or visual limitations.  (Id. at 377-79.)  He should avoid concentrated exposure to such pollutants as fumes, odors, dust, and gases and to areas with poor ventilation.  (Id. at 379.)

The ALJ also had before him documents from the VA relating to that agency's decisions rating Plaintiff's service-connected disabilities.  (Id. at 384-392, 394-412.)  A rating decision issued in August 2004 concluded that Plaintiff was 100% disabled based on knee pain, recurring strain in his lumbar spine, GERD, and sinusitis, including headaches.  (Id. at 384-85.)  This disability was effective May 14, 2004.  (Id.)  In November 2005, the VA further concluded that Plaintiff was "unable to secure or follow a substantially gainful occupation" based on his "significant restrictions with mobility" and his sedentary activities based on his lumbar strain.  (Id. at 395.)  His service-connected disabilities, i.e., his lumbar strain and his knee problems, combined to make him 80% disabled; added to that was the

20% disability attributable to his GERD, IBS, tinnitus, sinusitis, and bilateral carpal tunnel syndrome.  (Id.)

Additionally, the record included answers by a vocational expert, John McGowan, to written interrogatories submitted by the ALJ.  (Id. at 107-12.)  The VE was asked to assume the following individual.

> The claimant is 42 years old, has a high school education and three years of college, and a work history [of heavy, skilled work and of light, skilled work]. Assume that because of his combined impairments, including right knee patello-femoral syndrome, residual of left knee meniscus injury, history of lumbar strain, gastroesophageal reflux disease, history of irritable bowel syndrome, sinusitis, migraine vascular cephalgia, mild reversible airway disease, and obesity, he is limited to lifting or carrying no more than 25 pounds occasionally and 10 pounds frequently; standing or walking no more than 6 hours in an 8-hour workday with normal work breaks; crouching, kneeling, or crawling no more than occasionally; and no concentrated exposure to pulmonary irritants . . . .

(Id. at 111.)  Such a person, the VE reported, could perform past relevant work as a teacher's aide as it was defined in the Dictionary of Occupational Titles ("DOT"), not as it had been performed by Plaintiff.  (Id. at 112.)

## The ALJ's Decision

After summarizing Plaintiff's hearing testimony and allegations, the ALJ found that Plaintiff had not engaged in substantial gainful activity after the alleged onset date. (Id. at 14-15.) After summarizing the medical evidence, the ALJ further found that Plaintiff had (i) an affective disorder, i.e., a depressive disorder, not otherwise specified, with mild dysphoria and mild anxiety, controlled with prescribed psychotropic medication and not severe; and (ii) right knee patello-femoral syndrome, residuals of left knee meniscus injury, history of lumbar strain, GERD, history of IBS, sinusitis, migraine vascular cephalgia, mild reversible airway disease, mild carpal tunnel syndrome, and obesity, which, although severe, were not of listing level severity. (Id. at 15-18.)

The ALJ then addressed the question whether these impairments precluded Plaintiff from performing his past relevant work or other work. He accepted Dr. Singer's opinions as consistent with the objective medical evidence, gave great weight to Dr. Flury's opinion, significant weight to Dr. O'Day's opinions, and no weight to the VA's disability decision. (Id. at 19.) He then concluded that Plaintiff was precluded from performing more than light exertional work activity with non-exertional postural limitations and a precautionary restriction of avoiding concentrated pulmonary irritants. (Id.) Plaintiff had the residual functional capacity ("RFC") to perform work-related activities except for lifting or carrying more than twenty-five pounds occasionally and ten pounds frequently; standing or walking more than six hours in an eight-hour workday with normal work breaks; crouching, kneeling, or crawling more than occasionally; and concentrated exposure to pulmonary irritants. (Id.

at 20.)  In so concluding, the ALJ considered Plaintiff's allegations about the severity of his limitations and found them not credible because they were inconsistent with (a) his daily activities, (b) the lack of any restrictions placed on him by physicians, (c) his leaving his job for reasons unrelated to his medical conditions, and (d) the objective medical evidence.  (Id.) Weighing in favor of Plaintiff's credibility was his good work record; however, this was insufficient to alone support his allegations of disability.  (Id. at 21.)

Plaintiff could, consistent with his RFC, return to his past relevant work as a teacher aide as that job was generally performed in the national economy.  (Id. at 22.)  He was not, therefore, disabled within the meaning of the Act.  (Id.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B) (alteration added).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520.  See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002);

**Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities. . . ." Id. (alterations added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on h[is] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001) (alteration added).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added). "[RFC] is what the claimant

is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v.

Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."  **Id.**  See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

Additionally, the evaluation during the administrative review process of the severity of a mental impairment in adults must follow the technique set forth in 20 C.F.R. § 416.920a. This technique requires that the claimant's "pertinent symptoms, signs, and laboratory findings" be evaluated to determine whether the claimant has a medically determinable impairment.  Id. § 416.920a(b)(1).  The degree of functional limitation resulting from this impairment must then be rated.  Id. §§ 416.920a(b)(2) and (c).  This rating follows a specific format, identifying four broad functional areas and analyzing the degree of limitation in each area imposed by the mental impairment.  Id. §§ 416.920a(c)(3) and (4).  The degree of limitation in the first three areas is rated on a five-point scale:  "[n]one, mild, moderate, marked, and extreme."  Id. § 416.920a(c)(4).  The degree of limitation in the fourth area,

episodes of decompensation, is rated on a four-point scale: "[n]one, one or two, three, four or more."  Id.  A rating of "none" or "mild" in the first three categories and "none" in the fourth will generally result in a finding that the mental impairment at issue is not severe.  Id. § 416.920a(d)(1).  On the other hand, if the mental impairment is severe, the medical findings about that impairment and the resulting limitations in the four functional areas are to be compared "to the criteria for the appropriate listed mental disorder."  Id. § 416.920a(d)(2).  If the claimant has a severe mental impairment that does not meet or equal the severity of any listing, then the claimant's residual functional capacity is to be assessed. Id. § 416.920a(d)(3).  Section 416.920a(e) requires that the application of this technique be documented.  An ALJ is to document the application in his or her decision.  Id.

The burden at step four remains with the claimant.  **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Banks**, 258 F.3d at 824.  See also 20 C.F.R. § 404.1520(f).  The Commissioner may meet his burden by referring to the medical-vocational guidelines or by eliciting testimony by a vocational expert.  **Pearsall**, 274 F.3d at 1219.  If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently," **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

**Discussion**

Plaintiff argues that the ALJ's adverse decision is not supported by substantial evidence on the record as a whole because the ALJ erroneously considered his mental impairment to be nonsevere.  The Commissioner disagrees.

A severe impairment is one "which significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c) (alteration added).  Plaintiff alleges his depression and anxiety are severe impairments.  Depression is an affective disorder and falls under Listing 12.04; anxiety falls under Listing 12.06.  20 C.F.R. Pt. 220, Appx. 1, § 12.00(A).  These two listings each require that one or more of a set of clinical findings be met and, if met, two or three functional restrictions be met.  Id.  "For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment."  Id. at § 12.00(C).  Additionally, "[a]n individual's level of functioning may vary considerably over time.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time."  Id.

The clinical findings for depression in Listing 12.04 must include at least four of the following: "[a]nhedonia or pervasive loss of interest in almost all activities"; "[a]ppetite disturbance with change in weight"; "[s]leep disturbance"; "[p]sychomotor agitation or retardation"; "[d]ecreased energy"; "[f]eelings of guilt or worthlessness"; "[d]ifficulty concentrating or thinking"; or "[t]houghts of suicide."  20 C.F.R. Pt. 220, Appx. 1 (alterations

added). The relevant portion of Listing 12.06 requires"[g]eneralized persistent anxiety accompanied by three out of four of the following signs or symptoms:" "[m]otor tension; or [ ] [a]utonomic hyperactivity; or [ ] [a]pprehensive expectation; or [ ] [v]igilance and scanning." Id. (alterations added). In addition to the necessary clinical findings, to be considered severe under either Listing, there must be at least two of the following functional limitations: "[m]arked restriction of activities of daily living; or [ ] [m]arked difficulties in maintaining social functioning; or [ ] [deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or [ ] [r]epeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors)." Id. (alterations added). It is questionable whether Plaintiff satisfied the clinical criteria for either depression or anxiety[8]; regardless, Dr. Singer concluded that he did not satisfy the functional limitations for either Listing. This conclusion is supported by the evidence.

The relevant evidence is either the medical records or Plaintiff's testimony. Because the medical records of Plaintiff's psychiatric treatment depend on his complaints to the health care provider, his credibility is relevant.

---

[8]Plaintiff argues that the medical records show that he suffers from depressive disorder *and* anxiety disorder. The records show that he was diagnosed at various times with *one* of these disorders, depending on his predominant complaints at the time, and has never been diagnosed with both at the same time.

A mental impairment, anxiety disorder, is first referred to in Plaintiff's medical records in June 2002 when he went to the VA emergency room after taking a high blood pressure reading at home. Anxiety disorder was one of three diagnoses. Plaintiff was described as "seeming" to be anxious at a return visit the following month. The next reference to a mental impairment is six months after Plaintiff's alleged onset date when Plaintiff requested a referral to a mental health clinic. During this time, he had had to miss physical therapy sessions to visit friends. He had also had to miss physical therapy sessions because he had worked on his car – an activity he had expressly denied being able to do when applying for DIB – and planted grape vines. When Plaintiff did consult a psychiatrist, Dr. Busby, there were no signs of depression and his GAF indicated *mild* symptoms of depression or *some* difficulty in functioning. After consulting another psychiatrist, Dr. Neira, the following month and described as only appearing to be anxious, Plaintiff reported to a psychologist the month after that he was overwhelmed by various situations, including being terminated from his job for a different reason than he gave when testifying before the ALJ. Plaintiff met again with Dr. Neira in November 2003, a year after his alleged disability onset date, but was not complaint with his medication. When Plaintiff met again with a psychiatrist, Dr. Wessel, in February 2004, he was still not compliant with his medication and was assessed as having a GAF of 60, indicating moderate symptoms of depression or anxiety. Changes were made in Plaintiff's psychotropic medications by Dr. Agarwal in May 2004, following which Dr. Parkinson described him as "mildly" depressed. Several months later, in November, when Plaintiff had resumed taking his psychotropic medication after an

interval of not taking it, Dr. Parkinson again described him as "mildly" anxious and irritable.

As indicated above, Plaintiff was treated by various psychiatrists but by only one psychologist, Dr. Parkinson. Moreover, Dr. Parkinson's sessions with Plaintiff were usually twice as long as his sessions with the psychiatrists. Thus, Dr. Parkinson had more of a longitudinal picture of Plaintiff's depression or anxiety than did the four psychiatrists who treated him during the same time period. "'The [social security] regulations provide that a treating physician's opinion . . . will be granted 'controlling weight' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)) (alterations in original). Accord **Cox v. Barnhart**, 471 F.3d 902, 907 (8th Cir. 2006); **Goff v. Barnhart**, 421 F.3d 785, 790 (8th Cir. 2005); **Reed v. Barnhart**, 399 F.3d 917, 920 (8th Cir. 2005). The longer a claimant's health care provider has treated him and the more times, the more weight is given to that provider's opinion. 20 C.F.R. § 404.1527(d)(2)(i). When Plaintiff was compliant with his medication, Dr. Parkinson described the symptoms of his mental impairment as "mild." This adjective does not reflect the degree of functional limitations required by the regulations for a mental impairment to be severe.

Plaintiff notes that Dr. Wessel, one of the four psychiatrists, assessed him as having a GAF that reflected moderate functional limitations. A GAF is a "piece[] of the hypothetical puzzle necessary to gain an accurate overall assessment of [Plaintiff's] functioning." **Wilson v. Astrue**, 493 F.3d 965, 968 (8th Cir. 2007) (alterations added). It is a piece, however, and not the whole puzzle. Dr. Busby assessed Plaintiff as having a GAF of 70, indicative of mild symptoms. Dr. Wessel's assessment of 60 was during a time when Plaintiff was not compliant with his medication. See **Goff**, 421 F.3d at 793 (holding that ALJ did not err when finding claimant's depression was not severe on grounds that (a) GAF of *60* contradicted claimant's allegations of severe mental impairment and (b) records indicated that claimant was stable when taking antidepressant medication). See also **Kelley v. Barnhart**, 372 F.3d 958, 961 (8th Cir. 2004) (noting that a failure to follow prescribed treatment is inconsistent with severity of complaints).

As noted above, much of the support for Plaintiff's allegations of a severe mental impairment comes from his own testimony. That testimony is inconsistent with the lack of objective medical evidence also supporting those allegations, see **Gonzales v. Barnhart**, 465 F.3d 890, 895 (8th Cir. 2006), and with the evidence that the severity of Plaintiff's symptoms of depression or anxiety was significantly limited by treatment, including medication, see **Schultz v. Astrue**, 479 F.3d 979, 983 (8th Cir. 2007); **Guilliams v. Barnhart**, 393 F.3d 798, 802 (8th Cir. 2005). Additionally, the credibility of that testimony is weakened by Plaintiff leaving work for a reason unrelated to his impairments, see **Goff**, 421 F.3d at 793; **Kelley**,

372 at 961, and by inconsistencies between his testimony and the record, e.g., his inability to perform car maintenance and his doing so or his social isolation and his visits to friends on the east coast. And, regardless of whether Plaintiff's daily activities could be construed as supporting Plaintiff's claims, "[t]he ALJ [is] not obligated to accept all of [Plaintiff's] assertions concerning those limitations." **Ostronski v. Chater**, 94 F.3d 413, 418 (8th Cir. 1996) (alterations added). <u>See</u> <u>also</u> **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006) (affirming ALJ's negative assessment of claimant's credibility; claimant's "self-reported limitations" on daily activities were inconsistent with medical record).

For the foregoing reasons, the ALJ did not err in his determination on the severity of Plaintiff's mental impairment. <u>See</u> **Brosnahan v. Barnhart**, 336 F.3d 671, 676 (8th Cir. 2003) (affirming adverse decision of ALJ who concluded, inter alia, that claimant's affective disorder was not severe; claimant failed to meet two of the relevant Listing's requirements, i.e., that she have marked restrictions or difficulties in three of four categories or that she have repeated, extended periods of decompensation; claimant's difficulties were mild to moderate, she socialized "some" and there was no evidence of decompensation).

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that

would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (alterations added) (interim citations omitted).  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this <u>18th</u> day of September, 2007.